[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
INTRODUCTION
The plaintiff Jeffrey Poole and over one hundred other plaintiffs who are retired firefighters or surviving spouses of retired firefighters bring this action against the defendants City of Waterbury and the Waterbury Financial Planning and Assistance Board (the "Oversight Board"). Also named as defendants are individual members[1] of the City administration and of the Oversight Board. At issue is the action of the city, under the direction of the Oversight Board, in involuntarily switching the plaintiffs to a managed care health benefit plan. The city had previously provided to retired firefighters, and their eligible dependents, one of two health insurance plans — Anthem Century 94 and Century 96 — that had traditional indemnity features. As of April 1, 2002, the city intended to complete a conversion of all plaintiffs to a managed health care plan that utilizes a preferred provider organization.
THE LITIGATION
Each retired firefighter was, at the time of retirement, a member of the Waterbury Fire Fighters Association, Local 1339, International Association of Fire Fighters, AFL-CIO. The plaintiffs claim a contractual entitlement to the previous indemnity plans, under the collective bargaining agreements that were in force as each firefighter retired. The plaintiffs seek injunctive relief to have the city reinstate them to the Century 94 and 96 plans, and for money damages for any out of pocket costs expended by any of the plaintiffs as a result of the involuntary CT Page 10792 transfer to the managed care health plan. The City and the Oversight Board oppose injunctive and monetary relief, asserting that the plaintiffs have no entitlement to any particular health insurance plan or indeed to any health coverage at all.
The parties tried the case to the court over a period of eight days. During the course of the trial, the parties stipulated that the temporary injunction hearing would also serve as the hearing on the permanent injunction. The defendants also agreed not to institute the involuntary conversions of the plaintiffs to the managed care plan, pending the outcome of the litigation.
Leave was granted to file trial briefs until June 17, 2002, when final briefs were submitted.
The plaintiffs pursue their claims for injunctive and monetary relief on several legal theories: that the unilateral action of the defendants constitutes a breach of contract; that the action of the defendants constitutes an unconstitutional impairment of contract rights; and that the conduct constitutes an unconstitutional taking without just compensation. Because the court is persuaded that the evidence supports the first of these theories, it is unnecessary to discuss the other claims or defenses in the case.
THE LANGUAGE OF THE COLLECTIVE BARGAINING AGREEMENTS
The plaintiffs claim entitlement to the benefits of the Century 94 and Century 96 plans as a result of the language in five collective bargaining agreements between the City and the Waterbury Fire Fighters Association, the union of which each plaintiff was a member at the time of his retirement. Four of the plaintiffs, all of whom retired before July 1, 1986, prior to the first of these contracts, point to no contract language entitling them to health benefits, but rather claim entitlement to their specific health benefits through "custom and usage" of the Retirement Board of the City.
The language of the contract in effect from July 1, 1986, to June 30, 1989, provides:
Article XXXIII Pensions
Section 16. Effective July 1, 1986, the City of Waterbury shall continue in full force and effect the benefits for each retiree and each employee who retires or dies after July 1, 1986, his spouse, and each eligible dependent of such retiree or employee as described as follows: CT Page 10793
¶ 289a. (a) The Blue Cross semi-private room plan;
¶ 289b. (b) The Blue Cross maternity rider;
 ¶ 289c. (c) The Blue Cross . . . Basic Century 90 Plan . . . ;
 ¶ 289d. (d) The Major Medical Program currently in effect . . . ;
 ¶ 289e. (e) The Blue Cross-Blue Shield Full Service Prescription Drug Rider;
 ¶ 289f. (f) The Blue Cross-Blue Shield Home and Office Medical Care Rider (which presently has a $5 Deductible) known as the Century 96 Rider to the Century Contract
 Section 16a. The City will provide the medical insurance program prescribed in Section 16 hereof at no cost to those eligible.
The language of the contract in effect from July 1, 1989, to June 30, 1992, provides:
Article XXXIII Pensions
 Section 16. Effective upon the execution of this agreement, the City of Waterbury shall continue in full force and effect the benefits for each employee who retires or dies on or after the execution of this agreement, his spouse, if eligible, and each eligible dependent of such retiree as described as follows:
 . . . [same as (a) through (d) above for the 1986-1989 contract];
 ¶ 393e. (e) The Blue Cross-Blue Shield Full Service Prescription Drug Rider.
 Effective with the issuance of the award: (e) The Blue Cross-Blue Shield Full Service Prescription Drug Rider to age 65;
¶ 393f. (f) The Blue Cross-Blue Shield Home and Office Medical Care Rider (which presently has a $5 Deductible) CT Page 10794 known as the Century 96 Rider to the Century Contract. Effective with the issuance of the award: The Blue Cross-Blue Shield Home and Office Medical Care Rider known as the Century 94 Rider-180 to the Century Contract.
 Section 16a. The City will provide the medical insurance program prescribed in Section 16 hereof at no cost to those eligible.
The language of the contract in effect from July 1, 1992, to June 30, 1995, provides:
Article XXXIII Pensions
Section 16. . . . [same as above through ¶ 393d].
 ¶ 393e. (e) The Blue Cross-Blue Shield Full Service Prescription Drug Rider to age 65;
 ¶ 393f. (f) The Blue Cross-Blue Shield Home and Office Medical Care Rider known as the Century 94 Rider-180 to the Century Contract.
 Section 16a. The City will provide the medical insurance program prescribed in Section 16 hereof at no cost to those eligible.
The language of the contract in effect from July 1, 1995, to June 30, 1999, provides:
Article XXXIII Pensions
Section 16. . . . [same as above through ¶ 393f].
 ¶ 393g. The medical benefits for retirees prescribed in paragraph 393a through 393f may be substituted for similar — but in no event, less — medical benefits if the City and the Coalition of City Unions agree on a modified insurance plan for City employees; said modified medical program is currently under study by a committee consisting of the representatives of the City and representatives of all City Unions.
 Section 16a. The City will provide the medical insurance program prescribed in Section 16 hereof at no cost to those eligible. CT Page 10795
 Section 17. Effective as of the signing of this agreement a retiree who has attained the age of 65 years and receives medical insurance benefits per the provisions of this Article XXXIII and who is eligible for . . . Medicare . . . must participate in the Medicare program in which he is eligible to participate. The City will provide supplemental coverage . . . the payment for which will be made in the first instance by the retiree/spouse of retiree; which reimbursement will be made annually to the retiree/spouse of retiree upon proof of payment of the premium for said supplemental coverage by the retiree/spouse of retiree.
At the expiration of the previous contract on June 30, 1999, the City and the firefighters union had not reached agreement on a successor contract. An extended period of negotiations continued without success. Eventually the matter was submitted for binding arbitration beginning with hearings in June 2001 and ending with an award on December 14, 2001.[2] The award prescribed the obligations of the City and the Union for a period from July 1, 1999 (retroactively), through June 30, 2004. The terms of the award permitted those union members employed as of December 1, 2001, who were eligible for retirement to elect to retire under the terms of the expired contract, provided that the member so elect on or before January 30, 2002.
The terms of the arbitration award specified the following health benefits for all other employees who retired within the term of the award:
Article XXXIII Pensions
 Section 16. Those employees who are participating in the City's medical insurance plan at the time of retirement, and who retire with a full normal retirement, and who are not eligible for Medicare at the time of retirement shall be eligible to participate in such medical insurance plan which the City provides to its active bargaining unit employees, as such plans may change pursuant to any successor collective bargaining agreement, subject to the same conditions as may exist at any time for such active employees. Such coverage shall be provided to the retiring employee and his/her eligible spouse at the tim of retirement and/or eligible dependents at the time of retirement.
 Section 16a. Retirees shall pay a premium cost share according to the following: CT Page 10796
 (1) retirees who were actively employed on November 1, 2001 shall pay one-half (1/2) the dollar amount of the premium cost share for the plan he elects that active employees are required to pay at the time of his retirement; (2) retirees who were hired after November 1, 2001 shall pay the same premium cost share as active employees are required to pay pursuant to this agreement; and (3) retirees who retire on a disability pension and whom the Retirement Board has determined to be disabled pursuant to the Social Security standards for disability shall pay the same premium cost share set forth in (1) above.
 Section 17. . . . [same as Section 17 in previous contract].
All of the contracts have an expiration date, the language of which reads, "This agreement shall be effective as of July 1, 199, . . . and shall remain in effect through June 30, 199_."
THE FINANCIAL CRISIS OF THE CITY OF WATERBURY
The decision of the defendants to convert the retired firefighters from an indemnity-style health plan to a managed care health plan was the result of the economic plight of the City of Waterbury. Gross fiscal mismanagement over a number of years and over successive city administrations created what the state legislature found to be a "financial emergency" for the City of Waterbury. As a result, the Connecticut General Assembly enacted Special Act 01-1, mandating that certain fiscal and management controls be undertaken by the City and creating the Oversight Board to bring order out of chaos in the running of the City's financial affairs. The Oversight Board is composed of seven members including the Secretary of the Office of Policy and Management, the State Treasurer or her designee, the current Mayor of the City of Waterbury (newly elected after the effective date of the Act), and four members appointed by the Governor. The Special Act confers upon the Oversight Board wide-ranging authority to undertake the necessary measures to restore the financial stability of the City.
In reviewing the areas of unnecessary and irresponsible expenditures on the expense side of the City's ledger, the Oversight Board sought to address the problem of costs associated with retired city employees. For years the City had seriously underfunded its pensions. At present actuarial projections, the city pensions are underfunded by approximately $400,000,000. Separate from the impending deficit caused by the underfunded pensions, the failure to properly plan for funding of retiree health care benefits, coupled with the rising cost of health care, CT Page 10797 created a discrete problem in that area. Whereas the pension liabilities were "soft" in the early 1990s because the number of retirees was smaller and their pension benefits could be funded through incoming pension contributions, the liability has eventually become a "hard" item, because it must be paid out of the general fund. The health care benefits have always been paid out of the general fund. The City's bond rating has been downgraded as a result of these and other liabilities. Ultimately the fiscal reputation of the State of Connecticut, which essentially acts to guarantee certain of the City's obligations, is likely to be affected if the City does not enact a prudent fiscal plan.
The estimate of the Chair of the Oversight Board is that the conversion of retired city employees to managed health care plans similar to those in place for State of Connecticut employees will create a cost savings of $2,000,000 per year for the City. The failure of the City to bring prudent cost controls to retiree health benefits will create serious difficulties for the City in enacting the types of conservative budgets mandated by S. A. 01-1.
THE MODIFICATIONS IN THE HEALTH CARE BENEFITS
With the severe financial condition of the City in mind, the City and the Oversight Board examined the types of health plans currently provided to the plaintiffs and began a process of consultation with representatives of health insurance companies, including Anthem, the health care management company that administered the programs previously known under the name of Blue Cross and Blue Shield. Anthem, which administered the health care products provided to retired firefighters under all of the collective bargaining agreements, was selected to develop and administer a series of new, managed care products for city employees, including for retired firefighters.
Both the current and the proposed health plans for the plaintiffs are self-funded by the City. That is, the health care management company, Anthem, estimates the likely annual cost of providing the available benefits to the beneficiaries under the applicable plan and bills the City for that amount on an annual basis.
THE DIFFERENCES IN THE HEALTH CARE PLANS
The cost savings associated with the proposed managed health care plan, as distinguished from the former indemnity plans, is due to a number of factors.
One of these is the imposition of a co-payment by the beneficiary for each health service utilized. The amount of the co-payment ranges $5.00 CT Page 10798 for an outpatient visit up to $15.00 for the purchase of certain prescription drugs. The rest of the cost is borne by the health management company. Under the traditional indemnity plans, the beneficiary was fully reimbursed for most health services that were medically necessary, up to a certain combined cap, after which the beneficiary might be obligated to contribute a "deductible" amount.
Another is the ability of the management company to enlist physicians and other health care providers, such as physical therapists, into a preferred provider organization ("PPO"), to which the beneficiaries are then referred by Anthem. Significant discounts from the prevailing rate for a given health care service are then negotiated by the company with the providers in return for guaranteed payment and for patient referrals. Though patients are not required to utilize members of the PPO, the failure to do so when a member of the PPO is available in the patient's service area will result in most cases in the failure of the health plan to fully cover the costs of the service, resulting in the patient's responsibility to pay the difference in cost to the health care provider directly.
Combining aspects of these first two cost-saving devices is a third cost-saving mechanism, the incentive to use lower cost generic drugs instead of certain name-brand prescription drugs. The management company uses its size and relatively greater economic clout to negotiate discount rates with certain pharmaceutical companies for prescription drugs. The management company then allows the patient who needs a prescription drug to pay a lesser amount for the generic drug than for the relatively higher priced name-brand drug. Under the new plan, the difference ranges between $5 and $15 per prescription. Under the traditional indemnity plans, under which reimbursement was provided for medically necessary goods or services, there was no incentive for the provider or the patient to utilize thrift in the selection of prescription medication.
A fourth is the imposition of "management" on the utilization of services by the beneficiaries. Under a traditional indemnity plan, the patient and the doctor alone decided what services were indicated. Reimbursement for these services were paid by the health insurer, subject only to a determination by the insurer that the services were medically necessary. Under "managed care," the health management company maintains certain schedules not just for payments but also for levels of services, which act as the presumptively appropriate amount of service to which a patient is entitled for certain medical conditions. While the presumption can be overcome, this can only occur, at a minimum, through consultation by the patient or the provider with the management company. Often the consultation is less that than a negotiation. At worst it may result in a denial of services to which the patient must submit or else from which CT Page 10799 the patient must initiate a set of appeals through an administrative structure set up by the company.
For the City of Waterbury in particular, a fifth area of cost savings is likely to be achieved by the consolidation of substantially all City employees under one or two versions of an Anthem health benefit plan, as opposed to the variety of products that have, up to now, covered current and former City employees.
Though a managed health care plan is inherently less flexible than a traditional indemnity plan, it is by no means certain from the evidence that a given beneficiary will always fare worse under the new health care plan than the old. Even the old plans had a cap on the aggregate amount that was fully reimbursable for many services, after which the beneficiary was obligated to contribute an amount up to a certain "deductible" sum and a percentage of the cost thereafter — usually 20% for further such services. Depending on what health problems occur for a specific beneficiary and what services or prescription medications are necessary, the evidence demonstrated that there are situations in which the out-of-pocket costs can indeed be greater under the old plans than the new.
In fact, although much of the evidence centered on an attempt by the plaintiffs to prove that the effect of the proposed plan would always be to create a loss for each of the plaintiffs, the court is not persuaded that that will be the case. The whole rationale for "insurance" of any kind is that it recognizes our inability to precisely foresee what hazards may befall us, and it creates an economically viable way to spread the cost of the risk. If we could be sure that we would never suffer from heart disease, but rather only an occasional cold, we could eschew health care coverage altogether and save thousands of dollars over a lifetime. But we cannot be sure on an individual basis. Most of us do not choose to decline health insurance when it is available to us at a reasonable cost. Even so, many of us are likely to be mistaken about what disease or condition will plague us and when.
The plaintiffs here have succeeded in showing that there are significant differences between the traditional indemnity plans currently provided to them and the proposed managed care plan. The court cannot conclude that the differences are trivial, even though the plaintiffs have not shown that over their life expectancy they will suffer a specific quantifiable loss.
THE CONTRACT RIGHTS OF THE PLAINTIFFS
What the plaintiffs have shown through the evidence is that each of CT Page 10800 them who retired while he was covered by a collective bargaining agreement has a vested contract right to the specific health care plan to which that agreement refers. That being so, the City is not entitled to substantially modify the benefits or substitute a significantly different plan without the retiree's consent unless it is impossible to continue to provide the current plan. There is evidence that the current indemnity plans remain a product that Anthem is willing and able to provide to and administer for the City. Moreover, based on the evidence, the court finds that the current financial difficulties of the City, while distressing, do not make it impossible for the City to honor its contractual responsibilities to its retired firefighters.
The City and the Oversight Board argue that the law disfavors a construction that views health insurance benefits as vested rights, citing cases from five U.S. circuit courts. But these cases all construe the language of the Employee Retirement Income Security Act ("ERISA"),29 U.S.C. § 1001 et seq., which provides for the vesting of pension rights but not for health benefits.
There are understandable reasons why it is ill-advised to provide for the vesting of health benefits. Automatic vesting was rejected in the ERISA legislation because the costs of health benefit plans are subject to "fluctuating and unpredictable variables. . . . [such as] inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation." UAW, Local No. 1697 v. SkinnerEngine Co., 188 F.3d 130, 137-38 (3d Cir. 1999). The ERISA legislation does not govern the benefits at issue here.[3]
Conversely, no legislation prohibits the City from providing vested health benefits to retirees. Rather the rights of the plaintiffs to any particular health plan are governed solely by the collective bargaining agreements and the ordinary principles of contract law to which a court looks in construing such agreements. It may be that the city made a bad bargain by providing for vested health benefits, but it is nonetheless a bargain that is enforceable.
Nor does the case of Pineman v. Oechslin, 195 Conn. 405 (1985), cited by both sides, hold otherwise. In that case the question was whether the retiring state employees had any right to a benefit conferred solely by a state statute, the State Employees Retirement Act, Conn. Gen. Stat. § 5-152 et seq. The Supreme Court held that the statute did not create a vested contractual right.
Here the question is whether the contracts create a vested contractual right to a specific health care plan for life. If they do, it is a result of the language in each contract that recites that the City "shall CT Page 10801 continue in full force and effect the benefits for each employee who retires or dies on or after the execution of this agreement." The defendants argue that this language means that the City only agreed to continue those particular benefits in full force and effect for the duration of that contract, reserving the right to change the benefits or presumably even terminate them for retirees if the City chose to do so after the expiration of that contract. See, e.g., UAW, Local No. 1697 v.Skinner Engine Co., supra, at 142-44 (3d Cir. 1999). The plaintiffs argue that the language must be construed as providing for non-modifiable, lifetime benefits and that this interpretation is not defeated by the expiration of each collective bargaining agreement. See, e.g.International Union United Automobile, Aerospace, and AgriculturalWorkers of America v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir. 1984). In support of the latter interpretation, the plaintiffs point to the fact that the extension of health benefits to retirees was the subject of the collective bargaining process (obviously so, as the retiree benefits exist as a clause in each contract) and that it is unlikely that the parties would have intended such an important benefit to exist for the duration of only one contract cycle.
Compelling evidence came from the testimony of Palma Brustat, benefits administrator of the City of Waterbury for over twenty years. Ms. Brustat, though still in the employ of the defendant City, was particularly credible and instructive concerning the conduct of the City in handling the health benefits administration of firefighters who retired during the periods at issue. The City always treated the health plan that covered a firefighter at the time of his retirement as the specific health plan he was permanently entitled to carry, at least until he qualified for Medicare coverage. This was so even if modifications to the health plan had been instituted for current employees or newer retirees under a subsequent contract.
The court finds that the collective bargaining agreements contractually obligate the City to provide to each retiree upon his retirement the health plan he elected as of the date of his retirement. The way the City and the current and former union membership jointly interpreted the provisions of these contracts for almost two decades clearly indicates the intent of the parties to create a vested right to the health benefits that each firefighter elected on retirement.
The defendants argue that even if the collective bargaining agreements obligate the City to continue to provide a particular health care plan for retirees, S.A. 01-1 empowers the Oversight Board to unilaterally repudiate such an obligation in an effort to restore fiscal soundness to the City. Neither the language of the legislation nor the legislative history supports such an accretion of authority in the Oversight Board. CT Page 10802 Though the special act provides that its provisions shall supercede the provisions of most other statutes, the act provides that it shall not affect the provisions of the Municipal Employees Relations Act, Conn. Gen. Stat. § 7-467 et seq. Section 7-474 (e) provides for the validity and enforceability of municipal collective bargaining agreements. Special Act 01-1 in no way authorizes the repudiation of the rights that became vested under the collective bargaining agreements at issue here.
INJUNCTIVE RELIEF
The court finds that the plaintiffs have shown that they will suffer imminent and irreparable harm if they are compelled to switch health care plans and that they have no adequate remedy at law. Pet v. Department ofHealth Services, 207 Conn. 346, 370 (1988). The harm is not merely that the plaintiffs will be responsible for co-payments for goods and services for which no such payments were previously required. They are also harmed by the loss of the right for which they collectively bargained, a loss that cannot be fully replaced with money damages.
The plaintiffs have also proved that many retirees who travel in their free time will likely suffer some substantial inconvenience in locating and utilizing providers out of state, a significant drawback for those plaintiffs. Most importantly, the plaintiffs have demonstrated that there is a lack of flexibility for doctors and patients to make decisions about the type and duration of necessary medical services in the proposed managed health care plans, relative to the indemnity plans.
In determining whether an injunction should enter, the court can also consider and balance the injury complained of with any hardship imposed on the defendants by the issuance of the injunction. Tighe v. Town ofBerlin, 259 Conn. 83, 88, 788 A.2d 40 (2002); Moore v. Serafin,163 Conn. 1, 6, 301 A.2d 238 (1972). The court certainly attributes no bad faith to the defendants in the difficult and thankless task of trying to extricate the City of Waterbury from the fiscal quagmire into which it has foundered.
The evidence is unpersuasive that the hardship to the defendants in finding other areas in which to exercise austerity is greater than the hardship to plaintiffs in submitting to an involuntary conversion of their health benefits. This is particularly so in light of two factors. The first is the clear legal entitlement to the benefits under the indemnity plans that the plaintiffs have demonstrated during the course of this case. The second is the risk to the plaintiffs of having their health insurance plans terminated altogether, in light of the City's position that the plaintiffs have no legal entitlement at all to any CT Page 10803 health insurance coverage but rather are provided it at sufferance by the City.
In light of the announced intention of the City to promptly impose a wholesale involuntary conversion of the health care plans of the plaintiffs, the court finds that the requirements for injunctive relief have been met.
DAMAGES
The evidence offered by both sides in this case focused on the whether the defendants ought to be enjoined from converting the health care plans of the plaintiffs. The issuance of an injunction does not foreclose an award of damages in appropriate circumstances. See, e.g. Kloter v.Carrabetta Enterprises, Inc., 3 Conn. App. 103, 104-05 (1985). It was not until the evidence in the case was underway that there was a concession from the defendants that they would forbear the involuntary conversionpendente lite. Therefore it is unclear whether any plaintiff has yet suffered a monetary loss sufficient to require an award of damages. In light of the court's finding regarding the liability of the City, the court retains jurisdiction to consider an award of damages on behalf of any plaintiff on motion of any plaintiff filed within twenty days of the issuance of this decision. In the event of any such motion, the court retains jurisdiction to hear further evidence on the issue of damages only.
CONCLUSION
The court finds for the plaintiffs and issues an order enjoining the defendants from taking any action to involuntarily terminate any of the plaintiffs from the health care plan that each plaintiff elected at the time of his retirement or otherwise involuntarily transferring or enrolling any plaintiff in the managed health care plans proposed by the City. The court retains jurisdiction to conduct further proceedings related to enforcement of this injunction.
 _____________________________ Patty Jenkins Pittman, Judge
POOLE v. CITY OF WATERBURY, No. CV 02 0170301 (Oct. 2, 2002) JEFFREY POOLE, et al v. CITY OF WATERBURY, et al. 2002 Ct. Sup. 10804, 33 CLR 209
No. CV 02 0170301 Superior Court Judicial District of Waterbury. October 2, 2002
 CORRECTED MEMORANDUM OF DECISION
PITTMAN, JUDGE.
The plaintiffs and the defendants have both pointed out to the court an obvious error in the findings of fact, and thus an anomaly in the orders entered by this court in the court's Memorandum of Decision in this case filed August 15, 2002, #122.
The court misstated the stipulated facts concerning the involuntary conversion by the defendants of the plaintiffs to a managed health care plan. The parties had stipulated that the case could proceed, with the court consolidating for trial the motion of the plaintiffs for both a temporary and permanent injunction, without addressing the issue of temporary relief separately. The plaintiffs agreed not to contest on a temporary basis the involuntary conversion of the plaintiffs to a non-indemnity, managed health care plan, and the defendants obtained the commitment of the health plan administrator — Anthem — to re-convert the plaintiffs to their original indemnity plans in the event that the plaintiffs prevailed.
Accordingly in its Memorandum of Decision the court should have CT Page 10804-a described the status quo as one that included the unilateral involuntary conversion of the plaintiffs to the managed health care plan, rather than as a forbearance to proceed with the involuntary conversion by the defendants.
Nonetheless, the court's misstatement of the status quo does not alter the legal conclusion that the involuntary conversion, whether it be merely proposed or it be recently accomplished, represents a violation of the contract rights of the plaintiffs as described in the Memorandum of Decision. Nor does the law require that the court refrain from ordering injunctive relief to the plaintiffs because the order is of a mandatory nature rather than a prohibitory one. The facts of this case and the applicable law support the conclusion that the plaintiffs will suffer irreparable harm and that they have no adequate remedy at law in the present circumstances.
Accordingly, the court denies reargument but issues a correction, in response to the Motion to Reargue and Correct of the defendants, # 123, and in response to the motion of the plaintiffs entitled Motion to Correct Memorandum of Decision, not yet coded.
The Memorandum of Decision #122 is corrected to state the above stipulated facts. The court corrects and amends its order for injunctive relief to the following:
The court orders that the defendants forthwith take all necessary steps to reinstate each plaintiff to the health care plan in which each plaintiff was enrolled prior to the involuntary conversion to the managed health care plan on or about April 1, 2002, unless the plaintiff requests not to be so reinstated.
In light of the court's correction of its memorandum and order, the court grants the Application for Stay of Permanent Injunction, # 124, filed by the defendants, until today's date, in order to allow the parties to conform their conduct to the requirements of the corrected injunctive order.
Patty Jenkins Pittman, Judge